IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 1, 2022

## DEMARCO WATERS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 13-01885          James M. Lammey, Judge

_____

## No. W2021-00428-CCA-R3-PC

_____

The Petitioner, DeMarco Waters, appeals the denial of post-conviction relief with respect to his convictions for one count of first degree premeditated murder, three counts of attempted first degree murder, one count of attempted second degree murder, and four counts of employing a firearm during the commission of a dangerous felony, for which he received an effective sentence of life imprisonment plus seventy-seven years. On appeal, the Petitioner maintains that he received ineffective assistance of counsel at trial. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JILL BARTEE AYERS, JJ., joined.

Josie S. Holland, Memphis, Tennessee, for the appellant, DeMarco Waters.

Herbert H. Slatery III, Attorney General and Reporter; David H. Finley, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

The evidence presented at trial established that on September 4, 2012, the Petitioner entered Mr. Roderick Conley's apartment and shot at the occupants, who included Mr. Roderick Conley, Mr. Marvin Cole, Mr. Edris Conley, Mr. Justin Buckner, Mr. Avan Hardy, and Mr. Tevin Wright. *See State v. DeMarco Waters*, No. W2015-

01366-CCA-R3-CD, 2016 WL 4250146, at *1 (Tenn. Crim. App. Aug. 10, 2016). Mr. Cole, Mr. Buckner, and Mr. Edris Conley each sustained gunshot wounds, and Mr. Cole died as a result of injuries sustained from the shooting. *Id.* at *1-3. The Petitioner was indicted for first degree premeditated murder, five counts of attempted first degree murder, and five counts of employing a firearm during the commission of a dangerous felony. *Id.* at *1.

**Trial Proceedings**

According to the evidence presented at trial, on the day of the shooting, a group of men, including the Petitioner, Mr. Cole, Mr. Roderick Conley, Mr. Buckner, and Mr. Hardy were playing dominoes at Mr. Roderick Conley's apartment. At some point, the Petitioner went outside to make a telephone call. When the Petitioner returned, Mr. Cole, who was larger than the Petitioner, refused to move his chair to allow the Petitioner to pass. They began to argue, and everyone went outside where the argument continued. Mr. Roderick Conley testified that the argument did not become physical, but Mr. Buckner testified that the altercation also included "tussling" and "wrestling." Mr. Hardy recalled there was "tension" between the Petitioner and Mr. Cole because Mr. Cole had taken a thirty-two caliber gun from the Petitioner during the previous week and Mr. Cole was in possession of the gun while at the apartment.

The group returned to the apartment after five or ten minutes, when everyone became calm. The group began teasing the Petitioner and Mr. Cole, and the Petitioner kept saying, "[T]hat ain't right." The Petitioner left to purchase beer and told the group that he would not share his beer with them. The rest of the group left the apartment to purchase beer shortly thereafter.

Mr. Roderick Conley testified that the group saw the Petitioner at the store and that the Petitioner was surrounded by men whom Mr. Roderick Conley did not know. The Petitioner continued to be upset about his dispute with Mr. Cole. Mr. Hardy overheard the Petitioner say, "I need a strap, ASAP," which Mr. Hardy understood to mean a gun. The group purchased beer and returned to the apartment.

Mr. Wright, who arrived at the apartment with Mr. Edris Conley after the altercation but before the group went to the store, testified that as they were walking back to the apartment from the store, Mr. Cole told him about someone giving him a gun to hold and then wanting the gun returned. Mr. Cole told Mr. Wright that he and the man were involved in an altercation earlier in the day and that Mr. Cole did not return the gun and "punked him out." Mr. Wright recalled that sometime after they returned to the apartment, Mr. Cole went outside, shot the gun once, and then came back inside the apartment.

- 2 -

After the group had been at the apartment for a period of time, the Petitioner knocked on the door, and when someone asked who was there, the Petitioner responded, "Killer." Mr. Buckner asked, "Killer?" The Petitioner responded, "Yeah, Killer." Mr. Buckner stated, "Man, you better stop playin' for to get shot th[r]ough the door." Mr. Buckner testified that he had Mr. Cole's gun, a loaded thirty-two-caliber revolver, in his lap and that no one else had a gun. When someone opened the door and Mr. Buckner saw the Petitioner at the door, Mr. Bucker returned the gun to Mr. Cole, who put the gun in his pants pocket.

Mr. Roderick Conley testified that the Petitioner approached Mr. Cole in an "all business" manner as Mr. Cole was sitting on the couch. The Petitioner made a statement similar to "I see you st[r]apped up, huh," and then shot Mr. Cole. Mr. Roderick Conley stated that Mr. Cole never got his gun out of his pocket and that his hands were on the couch pushing as if he was trying to stand up when the Petitioner shot him. Everyone else in the house tried to take cover as the Petitioner continued shooting. Mr. Roderick Conley heard the Petitioner say, "I need one more round," as he fled after the shooting.

Mr. Hardy testified that the Petitioner calmly approached Mr. Cole and asked him if he had "some more shots" just before shooting him. Mr. Hardy stated that Mr. Cole was not holding a gun or trying to retrieve a gun from his pocket when the Petitioner shot him. Rather, Mr. Cole was attempting to stand and had his hand on a box of bullets. The Petitioner continued shooting at everyone, and Mr. Hardy was afraid. He heard the Petitioner yell, "I need another round," before fleeing the scene.

Mr. Buckner testified that when the Petitioner entered the apartment, he walked toward the couch and asked the group if they had obtained more guns. When they said they had not, the Petitioner began shooting. The Petitioner shot Mr. Buckner three times as Mr. Buckner was attempting to flee, and Mr. Buckner remained hospitalized for more than one month.

Mr. Wright testified that he ducked behind a table once the shooting began. The Petitioner never pointed his gun at Mr. Wright, and Mr. Wright did not believe the Petitioner noticed him because Mr. Wright was sitting on another couch by himself when the Petitioner entered the apartment. Mr. Wright stated that no one threatened the Petitioner before he began shooting and that the Petitioner remained calm throughout the incident. Mr. Wright had never met the Petitioner prior to that night.

Mr. Edris Conley testified that he was sitting next to Mr. Cole on a couch and listening to music when the Petitioner, whom he had not previously met, entered the apartment. Mr. Edris Conley saw the Petitioner's gun and looked up about the time the Petitioner began shooting. Mr. Edris Conley never saw Mr. Cole with a gun and never

heard anyone threaten the Petitioner prior to the shooting. Mr. Edris Conley stated that Mr. Cole appeared as if he were attempting to stand when the Petitioner shot him and that Mr. Cole did not have anything in his hands. After shooting Mr. Cole, the Petitioner continued shooting inside the apartment and shot Mr. Edris Conley in the leg. Mr. Edris Conley stated that the Petitioner fired several shots, looked around, and walked away while commenting that he needed another round. Mr. Edris Conley underwent eight surgeries and had a metal rod placed in his leg.

Mr. Roderick Conley testified that he owned a twenty-gauge, single-barrel shotgun, which was unloaded and underneath his bed in his bedroom at the time of the shooting. Mr. Buckner acknowledged that he testified during the preliminary hearing that the shotgun was leaning against a wall in the living room at the time of the shooting, but he testified at trial that he could not recall whether the shotgun was in the living room. He stated that no one pointed the shotgun at the Petitioner or otherwise threatened him with it. Mr. Wright said he did not see a shotgun on the night of the shooting. Following the shooting, officers located the shotgun under a mattress in the bedroom, and Mr. Edris Conley testified that he did not see anyone hiding firearms following the shooting and before the responding officers arrived.

Officers located seven spent forty-five caliber shell casings throughout the apartment. Special Agent Cervinia Braswell, a forensic firearms examiner with the Tennessee Bureau of Investigation, determined that the shell casings were fired from the same firearm. Officers located a thirty-two caliber revolver in Mr. Cole's pants pocket. They did not locate any spent thirty-two caliber bullets inside the apartment but located a live thirty-two caliber round outside the apartment.

Shelby County Medical Examiner Karen Chancellor testified that Mr. Cole's cause of death was a gunshot wound to the head. Dr. Chancellor could not determine the range from which the shot was fired or Mr. Cole's position when he was shot. She noted that Mr. Cole was approximately six feet tall and weighed 215 pounds. A prosecutor, who was the approximate size of Mr. Cole, stood next to the Petitioner, and Dr. Chancellor agreed that the prosecutor was bigger and taller than the Petitioner. A large portion of the bullet and some bullet fragments were recovered from Mr. Cole's head. Special Agent Braswell determined that the bullet fragments recovered from the gunshot victims were forty-five caliber bullets, but she could not determine whether they were discharged from the same firearm.

Memphis Police Detective Robert Wilkie interviewed the Petitioner, who denied any involvement in the shooting and maintained that he was with his aunt at the time of the shooting. Detective Wilkie interviewed the Petitioner's aunt, who said she was with

the Petitioner earlier on the day of the shooting but was not with the Petitioner at the time of the shooting.

Sometime after the Petitioner's arrest, a letter purportedly mailed by the Petitioner was returned to the jail as undeliverable. Officer Odell Underwood with the Shelby County Jail opened and read the letter and realized the letter was a request to have people assaulted or killed. He forwarded the letter to the homicide bureau. Detective Wilkie reviewed the letter and testified that the letter requested that someone ask "Fred," who lived in the apartment next to the scene of the shooting, to let him know when the victims were there so that a "surprise party" for the victims could be implemented to prevent them from testifying. Detective Wilkie believed the letter was a request to kill witnesses before the Petitioner's preliminary hearing.

Officers lifted fingerprints from the letter. Mr. Mark Milner, a latent print examiner with the Memphis Police Department, was accepted by the trial court as an expert in latent print examination and identification and testified regarding his examination of a fingerprint from the letter. He determined that there was sufficient ridge detail from the fingerprint to conduct a search of known fingerprints on the Automated Fingerprint Identification System ("AFIS"). The database generated a list of possible candidates. Mr. Milner stated that after comparing the list to the fingerprint submitted by the officers, one of the candidates on the list "was close enough to actually pull the fingerprint card," which depicted the known fingerprint of the Petitioner. Mr. Milner conducted a "manual comparison" of the Petitioner's fingerprint with the submitted fingerprint from the letter and concluded that they matched. Mr. Milner testified multiple times that he was "[o]ne hundred percent" certain that the Petitioner's fingerprint matched the submitted fingerprint from the letter.

On cross-examination, Mr. Milner testified that the submitted fingerprint was a partial fingerprint of the right middle finger. He said a complete fingerprint of the right middle finger could have sixty to one hundred potential points of comparison. In this case, he found twelve points of comparison were an exact match. Another latent print examiner in the same latent print division independently examined the fingerprints and reached the same conclusion.

Mr. Milner testified that multiple people could have fingerprints with similar but not exact characteristics with a partial fingerprint. He was aware of cases where latent print examiners had made erroneous identifications. He stated that no latent print examiner in his office had ever made an erroneous identification and that each fingerprint is examined independently by two latent print examiners in the office in order to prevent an erroneous identification.

On redirect examination, the prosecutor asked, "One hundred percent, that print belongs to [the Petitioner]?" Mr. Milner replied, "Yes, sir, without a doubt." The prosecutor then asked, "Stake your name on it?" Mr. Milner replied, "My name, my reputation, my career."

The jury acquitted the Petitioner of the charge of attempted first degree murder of Mr. Wright and the accompanying firearm charge. The jury convicted the Petitioner of attempted second degree murder of Mr. Edris Conley as a lesser included offense of attempted first degree murder. The jury also convicted the Petitioner of one count of first degree premeditated murder of Mr. Cole; three counts of attempted first degree murder of Mr. Buckner, Mr. Hardy, and Mr. Roderick Conley; and four counts of employing a firearm during the commission of a dangerous felony. The Petitioner received an effective sentence of life imprisonment plus seventy-seven years. This court affirmed the Petitioner's convictions and sentences on direct appeal but remanded to correct one of the judgments to reflect a conviction as a Class A felony. *See DeMarco Waters*, 2016 WL 4250146, at *1 (Tenn. Crim. App. Aug. 10, 2016).

## Post-Conviction Proceedings

The Petitioner filed a pro se petition for post-conviction relief and an amended petition following the appointment of counsel. As relevant to the issues raised on appeal, the Petitioner asserted that trial counsel was ineffective in failing to (1) present a theory of self-defense and request a jury instruction on self-defense; (2) object to the admissibility of the letter from the jail as unduly prejudicial; and (3) effectively cross-examine the latent print expert regarding his methodologies and conclusions.

Trial counsel testified that she had been an assistant public defender since 1994 and had tried over one hundred jury trials, including capital cases. She stated that during the course of her representation of the Petitioner, she met with him multiple times at the jail and during court appearances. They discussed possible motions, the State's evidence, the letter from the jail, and his mental health. The Petitioner had been diagnosed with schizophrenia, and trial counsel received information that he was taking his medication on a regular basis while in jail pending trial. A mental evaluation was conducted when the case was pending in general sessions court, and trial counsel had a second mental evaluation performed once she began representing him in the trial court. It was determined that the Petitioner was competent and that an insanity defense could not be supported.

Trial counsel testified that the Petitioner initially requested that his aunt be presented as a witness but that he "didn't really want her" upon learning that the State planned to call her as a witness. Trial counsel said that she discussed the possibility of

presenting a theory of self-defense but that the Petitioner had not decided whether he would testify at trial. Trial counsel recalled she discussed with the Petitioner the fact that if he testified, he would be given the opportunity to explain his intentions in writing the letter. She noted her concern about the Petitioner's ability to handle the State's cross-examination but ultimately left the decision up to the Petitioner. The Petitioner ultimately decided not to testify.

Trial counsel did not request a self-defense jury instruction at trial. She explained that she discussed the issue with co-counsel and one of the attorneys from the appeals division of the Shelby County Public Defender's Office and that they did not believe the proof at trial supported self-defense. She said no witnesses testified at trial that Mr. Cole had pulled a gun and was about to shoot the Petitioner when the Petitioner shot him. She stated that while the Petitioner may have known that Mr. Cole was armed at some point on the evening of the shooting, the Petitioner also told trial counsel that when he confronted Mr. Cole, Mr. Cole was not armed and that the person sitting next to Mr. Cole had possession of the gun. Trial counsel acknowledged that a witness had stated that a shotgun was in the corner of the room where the shooting occurred, but she did not recall whether this evidence came out at trial. She recalled that a large amount of shell casings were found in the parking lot of the apartment complex but that there was no evidence indicating that the shell casings resulted from shootings that occurred on the day of the shooting.

Trial counsel testified that during closing arguments, she argued that the evidence established voluntary manslaughter rather than first degree murder and that the Petitioner felt intimidated due in part to the fact that Mr. Cole was so much larger than the Petitioner. Trial counsel recalled that during the trial, one of the prosecutors, who was the same size as Mr. Cole, stood next to the Petitioner in order to show how much smaller the Petitioner was than Mr. Cole. Trial counsel was surprised by the verdict for one count of attempted second degree murder and was pleased with the acquittal on one count of attempted first degree murder. She recalled that during the trial, the State presented two plea offers. The first offer was for a thirty-four-year sentence, and the second offer was for a twenty-eight-year sentence. The Petitioner rejected both offers.

On cross-examination, trial counsel testified that she had presented a theory of self-defense in other cases and was familiar with the law and the steps necessary to argue self-defense. She agreed that evidence that Mr. Cole's gun remained in his pocket and that the Petitioner remained calm throughout the incident would hinder a claim of self-defense. She noted that although one witness indicated that the shotgun was leaned against a wall, the police later recovered the shotgun from a bedroom. Rather than argue self-defense, trial counsel argued that the Petitioner should be convicted of a lesser included offense such as voluntary manslaughter.

Trial counsel testified that she did not believe she had a basis upon which to object to the introduction of the letter purportedly written by the Petitioner from the jail. She had other cases with issues involving a defendant's statements and letters from the jail and the introduction of fingerprint evidence. She stated that had she believed she had any basis upon which to challenge the evidence, she would have raised it.

On redirect examination, trial counsel testified that she had read multiple opinions and books addressing fingerprint evidence and had attended seminars and the National Forensic College during which issues related to fingerprint evidence was discussed. She recalled that Mr. Milner, the latent print examiner, testified at trial that he was "one hundred percent certain" that the fingerprint from the letter belonged to the Petitioner. Trial counsel stated that she believed that at the time of trial, his testimony was acceptable and that sometime after the Petitioner's trial, entities such as the Federal Bureau of Investigation changed their standards to prohibit conclusions stated with such certainty. Trial counsel acknowledged, "I, at the time, probably didn't know as much as I do now and probably didn't … ask the same thing I would ask now." Trial counsel testified that had she objected to Mr. Milner's testimony about the certainty of his conclusion, she did not know whether the admission of the testimony would have been a viable issue on appeal based upon the status of the law at the time of the direct appeal had she objected to the testimony at trial.

On recross-examination, trial counsel agreed that the State's evidence was strong without the evidence of the letter and that the Petitioner's fingerprints on the letter were "the icing on the top of the State's case." She also agreed that by emphasizing the fingerprint evidence, she would have been emphasizing the importance of the letter, which did not include an explicit threat but alluded to "taking care of witnesses." She stated that information about fingerprinting and the operations of the latent print unit was not as well known or well published at the time of the Petitioner's trial.

Appellate counsel testified that he had been assigned to the appellate division of the Shelby County Public Defender's Office for approximately twelve years by the time of the post-conviction hearing and that he had represented defendants in ten to twelve appeals each year. Appellate counsel had raised issues involving self-defense in other appeals and was familiar with the requirements to pursue a self-defense claim. He did not specifically recall speaking to trial counsel about the Petitioner's case.

Appellate counsel testified that while fingerprint evidence is "pretty widely accepted," he did not believe an expert could conclude that one fingerprint matched another with one hundred percent certainty. Appellant counsel acknowledged that he had heard of "actual cases where there has been some duplication of identification based on fingerprint evidence."

- 8 -

On cross-examination, appellate counsel testified that he probably discussed the issue of self-defense with trial counsel during the course of the trial. He stated that he did not believe self-defense could be supported and that, as a result, the issue was not raised. Appellate counsel recalled that trial counsel attempted to obtain a conviction for a lesser included offense by arguing that the Petitioner was provoked into committing the shooting.

The Petitioner testified that although he met with trial counsel prior to the trial, they did not discuss the events resulting in the charges and that he did not recall what they discussed. He stated that he did not request that trial counsel pursue a theory of self-defense prior to trial. He acknowledged that he did not tell trial counsel that he was afraid on the night of the shooting and maintained that trial counsel never asked him what had occurred.

The Petitioner testified that following the trial, he told trial counsel that she should have raised self-defense. He explained that his self-defense claim was based upon Mr. Buckner's testimony during the preliminary hearing that prior to the shooting, Mr. Cole had one hand on his waistband while holding bullets in his other hand. The Petitioner stated that the group of men were passing guns around to each other when he knocked on the front door of the apartment. He denied that he announced that his name was "Killer" when he knocked. He stated that it was "obvious" that the victims hid the shotgun following the shooting, and he maintained that he shot Mr. Buckner as Mr. Buckner was reaching for the shotgun and that Mr. Buckner ran into the bedroom with the shotgun after he was shot. The Petitioner denied ownership of the gun found in Mr. Cole's possession.

At the conclusion of the proof, counsel for the Petitioner argued that trial counsel was ineffective in failing to request a jury instruction on self-defense and in failing to challenge Mr. Milner's testimony that he was "one hundred percent" certain that the fingerprint found on the letter belonged to the Petitioner. The post-conviction court made oral findings denying post-conviction relief, which the court later incorporated into a written order. The court found the Petitioner's testimony was not credible and credited trial counsel's testimony. The court found that after discussing the case with other attorneys in her office, trial counsel chose not to pursue a self-defense theory but, instead, to seek to obtain convictions for lesser included offenses based upon an argument of "heat of passion causing … a reasonable person to act in an irrational manner." The court also found that had trial counsel also pursued a self-defense theory, she "would have lost all credibility" and would have "ruined whatever argument she had for a lesser offense." The court determined that self-defense was not fairly raised by the proof. The court concluded that trial counsel was not deficient and that any deficiency did not result in prejudice.

The post-conviction court found that trial counsel was not deficient in addressing the fingerprint evidence. The court noted the description of the letter as "icing on the cake" as it related to the State's proof and concluded that no action or inaction by trial counsel resulted in prejudice.

## ANALYSIS

The Petitioner asserts that trial counsel was ineffective in failing to (1) request a jury instruction on self-defense, (2) challenge the admission of the letter from the jail, and (3) challenge the latent print examiner's testimony. The State responds that the post-conviction court properly denied the Petitioner's petition. We agree with the State.

The Post-Conviction Procedure Act provides for relief when a petitioner's conviction or sentence is void or voidable due to the abridgment of a right guaranteed by the United States Constitution or by the Tennessee Constitution. T.C.A. § 40-30-103. A claim that the Petitioner was denied effective assistance of counsel constitutes a mixed question of law and fact. *Moore v. State*, 485 S.W.3d 411, 419 (Tenn. 2016). An appellate court reviews de novo with no presumption of correctness the post-conviction court's conclusions of law, its determinations of mixed questions of law and fact, and its application of law to factual findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). The post-conviction court's factual findings are conclusive on appeal unless the record preponderates otherwise. *Nesbit v. State*, 452 S.W.3d 779, 786 (Tenn. 2014). An appellate court does not reweigh or reevaluate the evidence or substitute its own inferences for those of the fact-finder. *Kendrick*, 454 S.W.3d at 457. On appeal, we defer to the post-conviction court's findings regarding witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence. *Id.* The petitioner bears the burden of demonstrating the allegations of fact entitling him to relief by clear and convincing evidence. T.C.A. § 40-30-110(f).

A person accused of a crime is entitled to the assistance of counsel in criminal proceedings under the Sixth Amendment to the United States Constitution and under article I, section 9 of the Tennessee Constitution. These provisions guarantee the reasonably effective assistance of counsel. *Nesbit*, 452 S.W.3d at 786. The deprivation of this right is a cognizable claim under the Post-Conviction Procedure Act. *Moore*, 485 S.W.3d at 418. To prevail on a claim, the petitioner must show that trial counsel's representation "'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)).

In order to demonstrate that he received ineffective assistance of counsel, a petitioner must show both that trial counsel performed deficiently and that the deficient

performance prejudiced the defense. *Nesbit*, 452 S.W.3d at 786 (citing *Strickland*, 466 U.S. at 687). Failure to prove either deficiency or prejudice precludes relief, and the court need not address both components if the petitioner has failed to make a showing on one. *Calvert v. State*, 342 S.W.3d 477, 486 (Tenn. 2011).

To show deficient performance, a petitioner must demonstrate that "'counsel's representation fell below an objective standard of reasonableness' guided by 'professional norms' prevailing at the time of trial." *Felts*, 354 S.W.3d at 276 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 688). In other words, the petitioner must demonstrate that counsel's errors were "'so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). Counsel's performance is not measured by "'20-20 hindsight.'" *Id.* at 277 (quoting *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)). Instead, the court applies a strong presumption that counsel's performance was within the bounds of reasonable professional assistance. *Dellinger v. State*, 279 S.W.3d 282, 293 (Tenn. 2009). "'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Kendrick*, 454 S.W.3d at 458 (quoting *Strickland*, 466 U.S. at 690-91).

To show prejudice, a petitioner must establish that there is "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Felts*, 354 S.W.3d at 277 (quoting *Strickland*, 466 U.S. at 694). The question at its core is "'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.'" *Kendrick*, 454 S.W.3d at 458 (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)).

The Petitioner faults trial counsel for failing to request a jury instruction on self-defense. Trial counsel testified that she discussed the possibility of a self-defense claim with the Petitioner. However, the Petitioner chose not to testify at trial, thus inhibiting the ability to present such a defense. Furthermore, the Petitioner told trial counsel that Mr. Cole was not in possession of a gun when the Petitioner confronted him. Trial counsel was familiar with the law on self-defense and discussed the issue with co-counsel and an appellate attorney. She stated that they did not believe the evidence supported a claim of self-defense. As a result, she did not request a jury instruction on self-defense and, instead, chose to argue that the Petitioner's actions constituted voluntary manslaughter as a lesser included offense of first degree premeditated murder. The post-conviction court made a general finding crediting trial counsel's testimony. We conclude that trial counsel made a reasonable strategic decision to forego a defense that she did not

believe could be supported based upon her research and investigation and to, instead, argue for a lesser included offense. We will not second guess this reasonable, strategic decision, and we conclude that trial counsel was not deficient in this regard.

Furthermore, the post-conviction court found that even if trial counsel requested a jury instruction on self-defense, the request would have been denied because self-defense was not fairly raised by the proof. Tennessee Code Annotated section 39-11-611(b)(2) (Supp. 2012) provides in relevant part:

[A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable believe that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

A jury instruction on general defenses, including self-defense, is not required to be given to the jury "unless it is fairly raised by the proof." T.C.A. § 39-11-203(c). Sufficient evidence to fairly raise a general defense "is less than that required to establish a proposition by a preponderance of the evidence." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013). A trial court's determination in this regard "must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor." *Id.*; *see State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001); *Johnson v. State*, 531 S.W.2d 558, 559 (Tenn. 1975).

According to the proof presented at trial, the Petitioner and Mr. Cole got into an altercation earlier on the day of the shooting, and the victims who were at the apartment teased the Petitioner until he left. The Petitioner continued to be angry while at a store and was overheard stating that he needed a "strap," meaning a gun. He returned to the apartment while armed, approached Mr. Cole, and shot him in the head. No one testified that Mr. Cole was reaching for a gun, and his gun was later found in his pocket. The Petitioner continued shooting at the other unarmed victims and stated that he "needed another round" as he left the apartment. The surviving victims testified that the Petitioner remained calm during the shooting. Although the Petitioner claimed at the post-conviction hearing that he was acting in self-defense, he chose not to testify at trial. There was simply no proof that the Petitioner reasonably feared imminent death or

serious bodily injury when he shot at the victims. Because the evidence did not fairly raise the issue of self-defense, an instruction was not warranted, and trial counsel's decision not to request the instruction did not result in prejudice.

The Petitioner challenges trial counsel's performance related to the proof regarding the letter from the jail. He maintains that trial counsel should have objected to the admission of the letter and argues that "the probative value of the testimony regarding the letter could not have substantially outweighed its prejudicial effect, only serving to prejudice the jury against [the] Petitioner." The Petitioner also maintains that trial counsel was ineffective in seeking to exclude Mr. Milner's testimony, arguing that Mr. Milner's testimony "regarding his 100% certainty of the source of the letter's fingerprint failed to comport with accepted scientific standards surrounding forensic science."

Notwithstanding the admission of the letter and the fingerprint evidence, the proof supporting the Petitioner's convictions was strong. As this court stated in its opinion on the direct appeal, the evidence showed that the Petitioner "had a motive, procured a weapon prior to the attack, was calm in the moments before he began firing, used the element of surprise to keep the victims from defending themselves, only stopped his attack because he ran out of ammunition, and failed to render aid to any of the wounded after the shooting." *DeMarco Waters*, 2016 WL 4250146, at *5. Given the strength of the other evidence presented by the State at trial, we cannot conclude that any deficiency by trial counsel in failing to challenge the admission of the letter and the fingerprint evidence resulted in prejudice. Accordingly, the Petitioner is not entitled to relief.

**CONCLUSION**

Upon reviewing the record, the parties' briefs, and the applicable law, we affirm the judgment of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE

- 13 -